2010 Ark. App. 77

**Gary L. LAWHEAD, Appellant**

v.

**Mary Thompson HARRIS, Appellee.**

**No. CA 09–274.**

Court of Appeals of Arkansas.

Jan. 27, 2010.

William F. Sherman, Little Rock, for appellant.

Kincade Law Firm, Mountain Home, by: Ronald P. Kincade and Kerry D. Chism, for appellee.

JOSEPHINE LINKER HART, Judge.

Gary L. Lawhead appeals from an order of the Baxter County Circuit Court denying his petition to change primary custody of the child he fathered out of wedlock. On appeal, he argues that the trial court erred by (1) referring to Arkansas Code Annotated section 9–10–113 (Repl.2008) as a basis for its decision; (2) finding that he had provided no financial support for the child; (3) failing to find that there were material changes in circumstances requiring a change in custody that occurred since the previous custody order; and (4) there was no "justifiable basis" to grant appellee Mary Thompson Harris's motion for a directed verdict at the close of his case. We affirm.

N.L. was born on October 3, 2000. On December 13, 2004, an agreement to establish paternity was entered. In it, the parties agreed that custody would be vested in Harris, subject to extremely liberal visitation, defined essentially as the time that Harris was at work. The parties also agreed to have DNA testing performed. An order, styled "Agreed Decree" was signed on December 21, 2004, but not filed for record until January 10, 2005. Meanwhile, on December 30, 2004, Lawhead filed a petition to change custody. Lawhead filed yet another petition to change custody on April 11, 2005. By this time, the DNA test had established that Lawhead was indeed the father. On December 29, 2005, Lawhead filed a motion for contempt, in part seeking to enjoin Harris from quitting her job due to the potential deleterious effect it would have on his visitation. Apparently, the custody petitions were resolved by yet another agreed order that was entered on January 3, 2006. Lawhead was awarded what was termed "joint custody," but was in actuality merely visitation, inasmuch as Harris was given "primary care, custody and control of the minor child."

Notwithstanding the January 3, 2006 order, the contempt petition went forward. A show-cause order was entered on January 20, 2006. A hearing was set for and held on April 11, 2006. On September 11, 2006, while a decision on the contempt petition was still pending, Lawhead filed a motion styled "EMERGENCY PETITION," alleging that Harris had N.L. admitted to Vista Health in Fayetteville for treatment of "overly aggressive behavior." The petition further complained that Harris spanked the child and "forced [him] to stay in his room against his will," and asserted that Lawhead had not had contact with the child in two weeks. Also, appointment of an attorney ad litem was requested. On September 21, 2006, an order was entered that denied the contempt petition, but set a very detailed visitation schedule.

On September 25, 2006, Harris filed a motion styled "EMERGENCY PETITION TO TERMINATE VISITATION." In it, she alleged that Lawhead had "instructed N.L. that his bad behavior in school and at home would cause him to be able to come and live with his father sooner." The petition prayed that the court terminate or allow only limited, supervised visitation. On October 23, 2006, the circuit

judge who had handled the case recused, and all of the other circuit judges in the Fourteenth Judicial District did the same. On November 28, 2006, Lawhead filed another contempt petition. In this petition, Lawhead complained that Harris's signed authorization to release N.L.'s medical information was not forwarded to his attorney quickly enough. The same day, Lawhead filed another petition for change of custody. Harris then filed another petition for contempt on December 7, 2006, alleging that Lawhead was attempting parental alienation. On December 21, 2006, an attorney ad litem was appointed. On April 23, 2007, the case was heard and the parties agreed, at the behest of the attorney ad litem, that they would participate in family counseling and "defer to the counselor and his recommendations concerning visitation and other respects of the Order." The order also set out a definite and detailed visitation schedule.

On April 29, 2008, Lawhead filed yet another petition to change custody. In his petition he recited that Larry Cantrell had been providing family counseling to the parties and the minor child and that Cantrell recommended that the child "spend more time with his father." The petition also alleged that N.L. "indicated his desire to spend more time with his father."

At the hearing on this petition to change custody, Lawhead testified that he was 56 years old, disabled, and living on SSI. He formerly worked as a carpenter, but was no longer working after having had multiple hip surgeries. He lives in a trailer on his mother's eighty-acre farm. He complained of difficulty speaking with N.L. when he called on Tuesday and Thursday evenings and that Harris had missed some of the family counseling sessions. Lawhead also complained that he had observed some bruises on N.L.'s lower back, buttocks, and arm. He claimed that he had

"confronted" Harris about the bruises in a counseling session, but she denied that the bruises existed. Lawhead also complained about N.L.'s hygiene. He stated that six months prior to the hearing, N.L. frequently came to his visits with head lice. He claimed that when N.L. came for visits, he had dirty hair, long fingernails and toenails, and did not have socks or underwear. Lawhead also complained that Harris did not readily share information about N.L.'s school activities. He stated that he ate lunch at school with N.L. twice a week, and that was when he found out about N.L.'s extracurricular activities.

Lawhead asserted that the reason he filed his petition was because he desired "more time with his son." He wanted to be more involved in N.L.'s "care giving," which he defined as counseling, medical appointments, and school work. He stated that he wanted "half the time," rather than every other weekend. Lawhead described a typical visit. When N.L. wakes, he watches cartoons while Lawhead makes the child's breakfast. Then they "proceed to start feeding his animals and fish." They then ride on a tractor to a big pond to feed catfish, deer, and turkey. The rest of the day is spent shopping, bowling, playing video games, or going to see a movie. Lawhead further testified that he had recently bought a computer for N.L. to use. He admitted that Harris gave him extra visitation in the summer. He stated that they went camping several times.

Lawhead admitted that he did not pay child support for N.L. or for another child he had fathered, who was a year older than N.L. He also admitted that he did not provide insurance for the child, or pay any required co-pays, but asserted that he did buy his school lunch twice a week. He also claimed to have bought socks and underwear for N.L. He also admitted that he was not allowed to discuss the case with

N.L., and while he claimed to not remember telling the child to tell the attorney ad litem that he "mostly want[s] to stay with his daddy," he conceded that he "might have" told the child to "remind" him that he said that.

Larry Cantrell, the family counselor from the Pediatric Day Clinic, also testified in Lawhead's case. He stated that he had been seeing N.L. on a regular basis since February 2007. Cantrell stated that N.L. loves both his parents and opined that the "parents' inability to get along is the primary source of behavioral problems." He stated that "personally" he thought that N.L. should spend more time with his father. However, he cited marked improvement in N.L.'s behavior over the past year, noting that his problems that manifested in 2006 had resolved in 2007 and 2008. Cantrell observed that "whatever is going on right now is working." Further, he stated, "I do not see any change in circumstances that would require the Court to remove [N.L.] from his mother" and that he had "no evidence of harm or ill effect that has come to [N.L.] from living with his mother." Cantrell stated that the family counseling did not succeed and that he was "not sure [he] would like to" provide additional sessions to Lawhead and Harris.

Lawhead concluded his case with the testimony of his mother, Ina Mae Shaw. She stated that N.L. loves his father and enjoys spending time with him. She confirmed that Lawhead and N.L. spend time riding on a tractor and feeding corn to the wildlife. She stated that N.L. was doing "better in school and things like that."

At the close of Lawhead's case, Harris moved for a directed verdict, arguing that there was no change of circumstances since the last custody order, entered in December 2007. She further asserted that there was not "one shred of evidence that [the current custody arrangement was] not working." She noted that Lawhead had not been denied a single day of visitation, and in fact was given extra visitation, N.L. was "doing better in school," and "everything is improving." The trial court granted the motion.

In his findings from the bench, the trial judge summarized the lengthy procedural history of the parties' custody dispute. He called it "outrageous" and told the parties to "Stop it. Stop it. Stop it." He noted that they were tearing the child apart. He specifically found no material change of circumstances. The trial judge also noted that Lawhead had "not supported this child one dollar's worth as a non-custodial parent in the payment of child support," which failed to qualify him for receiving custody of his out-of-wedlock child.[1] Lawhead appealed.

On appeal from an order granting a directed verdict in a case that traditionally had sounded in equity, the court on appeal must decide specifically whether the plaintiff made out a prima facie case of entitlement to the relief requested. *Jamison v. Estate of Goodlett*, 56 Ark. App. 71, 938 S.W.2d 865 (1997). This requires that the evidence presented by the party against whom the directed verdict is sought must be given the highest probative value, taking into account all reasonable inferences therefrom. *Id.*

Because they are inextricably intertwined, we will take up Lawhead's first and second points together. He argues on appeal that the trial court erred by referring to Arkansas Code Annotated section 9–10–113 (Repl.2008) as a basis for its

---

1. The trial judge did not specifically mention that he was considering this proof in light of the requirements of Arkansas Code Annotated section 9–10–113 (Repl.2008).

decision and in finding that he had provided no financial support for the child. We believe that this argument is of no moment because it was referred to by the trial court as an alternative basis for granting a directed verdict. Harris's motion specifically asserted that Lawhead had not proved a material change in circumstances, and the trial court agreed. We note that it is so well settled as to be axiomatic that the trial court must first determine that a material change in circumstances has occurred since the last order of custody before it can even consider whether to change custody. *Tipton v. Aaron,* 87 Ark. App. 1, 185 S.W.3d 142 (2004).

■ We likewise take up Lawhead's third and fourth points together. He argues that the trial judge erred in failing to find that there were material changes in circumstances requiring a change in custody that occurred since the previous custody order and that there was no "justifiable basis" to grant appellee Mary Thompson Harris's motion for a directed verdict at the close of his case. He asserts that Cantrell's recommendation that N.L. "spend more time |₈with his father" and Cantrell's testimony that N.L. would like to do so, made granting the directed-verdict motion reversible error. We disagree.

Lawhead somewhat mischaracterizes Cantrell's testimony. While it is true that he stated that he "personally" thought that N.L. should spend more time with his father, he also testified that there was marked improvement in N.L.'s behavior over the past year, saying specifically that "whatever is going on right now is working." Moreover, he stated, "I do not see any change in circumstances that would require the Court to remove [N.L.] from his mother" and that he had "no evidence of harm or ill effect that has come to [N.L.] from living with his mother."

■ Furthermore, in our review, we did not find that Lawhead made a prima facie case of a material change of circumstances. The child was situated in the same home and school and was doing "better" in that setting than he had been at the time the previous custody order was entered. The bruises that Lawhead claimed he saw were apparently either not there, or of no significance because their existence was denied by Harris and apparently discounted or disbelieved by Cantrell. Finally, we hold that Lawhead's accusations that N.L.'s personal hygiene was being neglected do not constitute a material change of circumstances. We note that even N.L.'s alleged problems with head lice, by Lawhead's own account, had apparently resolved six months before the hearing. While it is undoubtedly true that Lawhead desired to spend more time with his child, it is settled law that custody awards are not made or changed to punish, reward, or gratify the desires of either parent. *Calhoun v. Calhoun,* 84 Ark. App. 158, |₉138 S.W.3d 689 (2003).

Affirmed.

KINARD and HENRY, JJ., agree.